# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARDELLA EQUIPMENT CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CASE NUMBER: 3:02CV2076(AHN) |
| v. ) | |
| ) | |
| BALFOUR BEATTY CONSTRUCTION, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |
| and ) | |
| ) | SEPTEMBER 22, 2004 |
| BALFOUR BEATTY CONSTRUCTION, INC., ) | |
| ) | |
| Counterclaim Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| GARDELLA EQUIPMENT CORPORATION, ) | |
| ) | |
| Counterclaim Defendant. ) | |
| ) | |
| | ) **BALFOUR BEATTY CONSTRUCTION, INC.'S** |
| and | ) **MEMORANDUM OF LAW IN SUPPORT OF** |
| | ) **ITS MOTION FOR SUMMARY JUDGMENT** |
| BALFOUR BEATTY CONSTRUCTION, INC., ) | |
| ) | |
| Third Party Plaintiff, ) | |
| v. ) | |
| ) | |
| NORWALK MARINE CONTRACTORS, INC., ) | |
| ) | |
| Third Party Defendant. ) | |

Defendant, Balfour Beatty Construction, Inc. ("Balfour Beatty"), by and through its undersigned counsel, and pursuant to D. Conn. L. Civ. R. 7(a), hereby submits this memorandum of law in support of its Motion for Summary Judgment.

I.  **BACKGROUND INFORMATION**

Balfour Beatty served as the general contractor on the Sikorsky Bridge reconstruction project. (Ex. C, p. 101.)[1] Balfour Beatty entered into an oral agreement with Plaintiff, Gardella Equipment Corporation ("GEC"), for the use of GEC's tugboat "Lukie" in shifting barges on the project. (Ex. D, pp. 134-137; Ex. P, p. 382.)

On September 4, 2001, Balfour Beatty took possession of the "Lukie in Norwalk, Connecticut, at the yard of Third Party Defendant, Norwalk Marine Contractors, Inc. ("NMCI"), an affiliate of GEC. (Ex. B, pp. 13-14, 18-22; Ex. D, p. 146; Ex. O, p. 381.) GEC and NMCI have the same president and are located at the same address. (Ex. B, pp. 13-14, 18-20.) The "Lukie" was built in 1942 and GEC and NMCI valued it at $60,000 on their marine insurance policy with CNA. (Ex. A, p. 2 at ¶7; Ex. B, p. 39; Ex. M, p. 359; Ex. S, p. 433.) Unbeknownst to Balfour Beatty, the "Lukie's" hull had been poorly maintained and was in a deteriorated and unseaworthy condition. (Ex. A, p. 2 at ¶7; Ex. S, pp. 436-437; Ex. T, pp. 438-439.)

On September 4, 2001, when Balfour Beatty took possession of the vessel, GEC and NMCI deleted the "Lukie" from their insurance policy. (Ex. B, pp. 62-63; Ex. M, p. 373.) Neither Balfour Beatty nor GEC/NMCI performed an on-hire survey of the tugboat. (Ex. B, pp. 44, 46-47; Ex. D, p. 162.)

Balfour Beatty exercised due care in operating the "Lukie" and when finished using it contacted GEC/NMCI to redeliver the vessel. (Ex. B, p. 56; Ex. D, p. 155; Ex. E, pp. 171, 173-175; Ex. F, pp. 216-217, 225; Ex. G, p. 242.) GEC/NMCI directed Balfour Beatty to return the "Lukie" to NMCI's jobsite at the Tomlinson Bridge in New Haven Harbor. (Ex. B, p. 58; Ex. D, p. 155; Ex. G, pp. 242-244; Ex. H, p. 265.) On October 12, 2001, Balfour Beatty, as directed, returned the

---

[1] Citations are to the separately filed exhibits cited to by Balfour Beatty in its Local Rule 56(a)1

"Lukie" in New Haven at about 11:30 a.m. where GEC/NMCI reassumed possession, custody and control over the vessel. (Ex. B, pp. 63, 66; Ex. G, p. 242; Ex. I, p. 279; Ex. M, p. 373; Ex. O, p. 381; Ex. P, p. 382.)

Upon its arrival, NMCI employees assisted in tying up and securing the "Lukie", boarded and inspected the vessel and found no evidence of leakage or damage. (Ex. E, pp. 178-179, 186, 191-193; Ex. F, pp. 222-224; Ex. G, pp. 245-246; Ex. O, p. 381.) NMCI employees again boarded the vessel in the afternoon and found no evidence that it was taking on water. (Ex. I, pp. 280-282, 285; Ex. J, p. 308.) Throughout the afternoon of October 12, 2001, and even as late as 11:00 p.m., various NMCI employees observed the "Lukie" floating properly. (Ex. H, p. 269; Ex. I, pp. 287-288; Ex. J. p. 309; Ex. S, p. 433; Ex. W, p. 449.)

On October 12, 2001, the day Balfour Beatty redelivered the vessel, GEC/NMCI added the "Lukie" back to their CNA insurance policy. (Ex. B, p. 64; Ex. M, p. 374.) On the morning of October 13, 2001, the day after Balfour Beatty redelivered the vessel to GEC/NMCI as directed, the "Lukie" was found sunk. (Ex. H, pp. 265-267; Ex. S, p. 433.)

In an effort to salvage the "Lukie", GEC/NMCI mobilized the barge "Lynn", the pushboat "Jane O", a crane and two pumps. (Ex. B, pp. 27-28, 67; Ex. I, p. 289.) However, on October 21, 2001, and before any attempt was made to raise the "Lukie", the barge, the pushboat, the crane and the pumps were also found sunk. (Ex. B, pp. 27, 67-68, 71; Ex. G, pp. 247-250; Ex. I, p. 289; Ex. R, pp. 385, 396-397; Ex. V, pp. 447-448.)

Surveyors retained by CNA, GEC's and NMCI's insurer, and by Balfour Beatty concluded that vandalism was the cause of these sinkings. (Ex. R, pp. 389-390; Ex. S, p. 434.) Apparently, someone broke into the "Lynn" and drove the crane that was placed on the barge off the vessel,

---

Statement and to the consecutive pagination of the exhibits.

causing the "Lynn" to capsize and sink. (Ex. B, p. 71; Ex. I, p. 289; Ex. S, p. 434.) The pumps on the barge sank, as well as the pushboat "Jane O" which was tied to the "Lynn". (Ex. B, p. 71; Ex. I, p. 289; Ex. R, p. 385.) Louis "Skip" Gardella, GEC's and NMCI's president, submitted a Proof of Loss to CNA stating under penalty of perjury that he, too, believed the sinking of the "Lynn" to be caused by vandalism. (Ex. V, pp. 447-448.)

On November 5, 2001, after an initial failed attempt, the "Lukie" was eventually raised and the next day was moved by GEC/NMCI across the river and abandoned at a scrap metal yard. (Ex. B, pp. 68, 72-73; Ex. R, pp. 392-394, 415; Ex. S, p. 434.) It remained beached and resting on its hull at the scrap yard until the shipyard's owner demanded its removal. (Ex. R, pp. 394, 415; Ex. S, p. 436.) The "Lukie" was then given to a towing and salvage company that dewatered the tugboat (it had become resubmerged at the scrap yard) and towed it to a shipyard in Fair Haven, Massachusetts. (Ex. B, p. 75; Ex. S, p. 436; Ex. T, pp. 438-442.)

On November 20, 2001, a survey was performed on the "Lukie" in Fair Haven by two surveyors retained by GEC's and NMCI's insurer and one surveyor retained by Balfour Beatty. (Ex. S, pp. 436-437; Ex. T, p. 438.) At this time, all three surveyors came to the identical conclusion -- that the "Lukie" sank due to a small hole on the underside of the vessel which was caused by wastage and corrosion of the hull, and not because of an assumed grounding on Balfour Beatty's part or an accidental occurrence. (Ex. S, pp. 436-437; Ex. T, pp. 438-439.) The surveyors found that the underside of the "Lukie" was pockmarked with deep corrosion pits, the hull lacked any zinc protection, ample evidence of poor maintenance, and an extremely thin hull with many deteriorated steel plates welded to the bottom. (Ex. S, pp. 436-437; Ex. T, pp. 438-439.)

On November 26, 2001, CNA declined to pay for the loss of the "Lukie" and all costs incurred in raising the vessel because the opening in the hull was determined to be caused by

gradual deterioration caused by ordinary use and lack of maintenance. (Ex. U, p. 445-446.) On November 21, 2002, GEC sued Balfour Beatty for breach of contract (Count I), bailment (Count II), negligence (Count III), subrogation for salvage costs (Count IV), subrogation for pollution remediation costs (Count V) and indemnity (Count VI).

## II. SUMMARY OF ARGUMENT

GEC claims damages of $85,000 for what it now contends is the value of the "Lukie" (GEC insured the vessel for only $60,000). GEC also claims damages in the amount of $137,889.04 for "unreimbursed salvage costs, equipment, machinery, pollution costs and labor associated with the sinking of the 'Lukie' as well as the 'Jane O', 'Lynn', the crane and the two pumps and the raising and salvage of same." (See GEC's October 16, 2003 Damage Analysis attached hereto as Exhibit 1, and GEC's March 3, 2003 Initial Disclosure Pursuant to Rule 26 (a)(1) attached hereto as Exhibit 2 at pages 4 and 5.) Balfour Beatty is entitled to summary judgment that it is not responsible for any of these damages.

It cannot be genuinely disputed that Balfour Beatty was in no manner involved with the sinking of the barge "Lynn", the pushboat "Jane O", the crane and the two pumps. Nor can it be genuinely disputed that vandalism or some other event unrelated to Balfour Beatty caused the sinking of these vessels and equipment nine days after Balfour Beatty returned the "Lukie" to GEC. It was not foreseeable that these other vessels and equipment would sink because of vandalism even if Balfour Beatty operated the "Lukie" negligently (which it did not). The sinking of these other vessels and equipment, before they could even be used by GEC to try to raise the "Lukie", was a fortuitous event. Any link between these sinkings and Balfour Beatty's operation of the "Lukie" is too tenuous for liability to attach to Balfour Beatty as a matter of law.

Moreover, even assuming for argument's sake that it was foreseeable that the "Lynn", the

5

"Jane O", the crane and the pumps would sink if Balfour Beatty operated the "Lukie" negligently, the intervening event of vandalism, or some other event unconnected to Balfour Beatty, was the superseding cause of their sinking, thus relieving Balfour Beatty of any liability. Therefore, Balfour Beatty is entitled to summary judgment that it was not the legal, proximate cause of any damages to GEC relating to the sinking of the "Lynn", the "Jane O", the crane and the pumps.

GEC's claims against Balfour Beatty relating to the sinking of the tugboat "Lukie" must also fail. GEC cannot prove causation because there is no credible, non-speculative record evidence that the "Lukie" ran aground, touched bottom or struck a submerged object while Balfour Beatty operated the vessel. Moreover, at the time the tugboat "Lukie" sank GEC had reassumed full possession, custody and control over the vessel which sank because of ordinary wear and tear excacerbated by its deteriorated condition and lack of maintenance. Therefore, any damages to GEC caused by the sinking of the "Lukie" are GEC's own responsibility. Accordingly, Balfour Beatty is entitled to summary judgment as to all of GEC's claims against it relating to the sinking of the "Lukie."

### III.   SUMMARY JUDGMENT STANDARD

Summary judgment should be entered under Federal Rule of Civil Procedure 56(c) "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving parting is entitled to judgment as a matter of law." Phoenix v. Reddish, 175 F. Supp. 2d 215, 217 (D. Conn. 2001). Moreover, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation. Instead, the non-moving party must produce specific, particularized facts indicating that a genuine factual issue exists…. If the evidence produced by the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted." Id (citations omitted). Further, summary judgment is appropriately entered "'after adequate time for

discovery and upon motion against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case and on which the party will bear the burden of proof at trial.'" Doe v. British Universities North American Club, 788 F. Supp. 1286, 1289 (D. Conn. 1992), citing to Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2522, 91 L.Ed.2d 265 (1986).

## IV. ARGUMENT

### A. Balfour Beatty's Actions Were Not The Proximate Cause Of GEC's Damages Relating To The Sinking Of The Barge "Lynn", The Pushboat "Jane O", The Crane And The Two Pumps

The elements of a negligence action are the same whether brought under the general maritime law or the common law. Naglieri v. Bay, 93 F. Supp. 2d 170, 174 (D. Conn. 1999). Moreover, "**[i]n order to prevail on a claim for negligence under the general maritime law, the burden is on the plaintiff to establish** duty, breach of duty, causation (both cause in fact and **proximate cause)** and damages." Id (emphasis added). Further, "[w]hile proximate cause has been characterized as essentially a factual issue, it becomes a conclusion of law when the mind of a fair and reasonable person could reach only one conclusion." L.G. Defelice v. Fireman's Ins. Co., 41 F. Supp. 2d 152, 164 (D. Conn. 1998) (citations omitted).

In Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 837, 116 S. Ct. 1813, 1817-18, 135 L. Ed. 2d 113 (1996), the United States Supreme Court upheld the requirement of proximate cause and the viability of the superseding cause doctrine in admiralty cases. The Exxon Court stated that admiralty courts should "draw guidance from, *inter alia*, the extensive body of state law applying proximate cause requirements and from treatises and other scholarly sources" to determine whether a defendant's fault was the legal cause of alleged damages. Id. at 839, 116 S. Ct. at 1818.

The Exxon court explained that proximate cause principles also apply to damages alleged

7

in breach of contract actions.

> Although the principles of legal causation sometimes receive labels in contract analysis different from the "proximate causation" label most frequently employed in tort analysis, these principles nevertheless exist to restrict liability in contract as well. Indeed, the requirement of foreseeability may be more stringent in the context of contract liability than it is in the context of tort liability.

Id. at 839-40, 116 S. Ct. at 1819.

**"In admiralty the touchstone of proximate cause is foreseeability; the injury or damage must be a reasonably probable consequence of the defendant's act or omission. Thus, policy considerations may preclude liability even if there is cause in fact if the causal chain of events is too tenuous."** 1 T. Schoenbaum, Admiralty and Marine Law § 5-3 (4th ed. 2004) (emphasis added).

As the Supreme Court has also recently explained:

> In the past, the Court has applied the term "'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L.Ed.2d 532 (1992). The Court has explained that, "[a]t bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" *Ibid.* (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 41, p. 264 (5th ed. 1984) (hereafter Keeton)); see also *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 352, 162 N.E. 99, 103 (1928) (Andrews, J., dissenting) (**"What we do mean by the word 'proximate" is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point"**).

Archer v. Warner, 538 U.S. 314, 326, 123 S.Ct. 1462, 1470, 155 L.Ed.2d 454 (2003) (emphasis added). See also Doe v. British Universities North American Club, 788 F. Supp. 1286, 1293-94 (D. Conn. 1992) (granting summary judgment in favor of the defendant in part because the plaintiff failed to establish proximate cause for his alleged injuries).

8

Here, it is undisputed that Balfour Beatty had absolutely no connection to the barge "Lynn" and the concomitant submerging of the "Jane O", crane and pumps. Skip Gardella, GEC's and NMCI's president, testified as such.

> Q. Okay. Are you aware of anything that Balfour Beatty might have done to cause the sinking of the Lynn?
>
> A. I have no speculation or **there's nothing to suggest that they had anything to do with it.**

(Ex. B, p.139, lines 3-8, emphasis added.) There is no record evidence to the contrary.

GEC cannot show that Balfour Beatty proximately caused GEC's alleged damages in connection with the sinking of the "Lynn", the "Jane O", the crane and the pumps which occurred nine days after the "Lukie" sank and before they could even be used to try to raise the "Lukie". Therefore, the Court should decline to trace Balfour Beatty's responsibility in this lawsuit beyond the sinking of the "Lukie" and determine via summary judgment that Balfour Beatty's actions in operating the "Lukie" are too remote to constitute the legal cause of the sinkings of the "Lynn", the "Jane O", the crane and the pumps. The harm caused to GEC by the sinking of these other vessels and equipment was simply not within the scope of risk created by any use of the "Lukie" by Balfour Beatty and the mind of a fair and reasonable person could only reach one conclusion -- that Balfour Beatty's actions did not proximately cause the sinking of the "Lynn", the "Jane O", the crane and the pumps or damages flowing therefrom. See Archer, Exxon, Defelice, British Universities, supra.

### B. Intervening Events Were The Superseding Causes Of The Damages Associated With The Barge "Lynn", The Pushboat "Jane O", The Crane And The Two Pumps, Thereby Relieving Balfour Beatty From Liability

Balfour Beatty is also entitled to summary judgment that it is not legally responsible for the damages associated with the "Lynn", the "Jane O", the crane and the pumps because intervening, superseding events caused these damages, not any action or inaction on the part of Balfour Beatty.

9

Another aspect of proximate causation is whether an intervening or superseding cause relieves the defendant of liability. **In some cases the defendant may be at fault, but the plaintiff or a third party may have committed an act which supersedes, in terms of cause, the fault of the defendant.** The doctrine of superseding cause is thus properly applied to preclude direct causation....

**Thus, despite the foreseeability of the harm and "but for" causation, an intervening act can constitute a superseding cause, relieving the original actor from liability.** In order for an intervening act to be a superseding cause:

(1)   the intervening force must bring about a harm that is different in kind from that which would otherwise have resulted from the actor's negligence;

(2)   the intervening force must not be a normal result of the original actor's negligence.

**The doctrine of superseding cause is thus applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable.** It is properly applied in admiralty cases.

1 T. Schoenbaum, Admiralty and Maritime Law § 5-3 (4th ed. 2004) (emphasis added).

Further, as the Supreme Court has recently stated:

> **[T]he common law is clear that certain intervening events-- otherwise called "superseding causes"--are sufficient to sever the causal nexus and cut off all liability.** See *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837, 116 S. Ct. 1813, 135 L. Ed. 2d 113 (1996) ("'The doctrine of superseding cause is ... applied where the defendant's negligence in fact substantially contributed to the plaintiff's injury, but the injury was actually brought about by a later cause of independent origin that was not foreseeable'" (quoting 1 T. Schoenbaum, Admiralty and Maritime Law § 5-3, pp. 165-166 (2d ed. 1994)); 57A Am.Jur.2d, Negligence § 790, p. 701 (1989) ("**The intervention, between the negligence of the defendant and the occurrence of an injury to the plaintiff, of a new, independent, and efficient cause, or of a superseding cause, of the injury renders the negligence of the defendant a remote cause of the injury, and he cannot be held liable, notwithstanding the existence of some connection between his negligence and the injury**").

Archer, 538 U.S. at 326-27, 123 S. Ct. at 1470 (emphasis added).

Here, the intervening event of vandalism caused the sinking of the "Lynn", the "Jane O", the crane and the pumps. Skip Gardella, GEC's and NMCI's president, submitted to CNA a Proof of Loss in connection with the sinking of the "Lynn" wherein he represented "under penalty of perjury" that:

> The barge [Lynn] with equipment aboard including a crane, was discovered sunk on the morning of October 21, 2001. Though we are uncertain as to what Endorsement No. 6 refers to when it calls for comment as to the "origin" of the loss, **we believe that the sinking was caused by vandalism.**

(Ex. V, p. 448, emphasis added.) Moreover, Doran Podoloff, a marine surveyor retained by GEC's and NMCI's insurer, found that "the barge 'LYNN' was submerged when someone entered the Bucyrus Erie crane on the 'LYNN' on the night of October 20, 2001, started the crane and drove it off the starboard side of the barge 'LYNN'" which caused it to capsize and to submerge the pumps and the pushboat "Jane O". (Ex. R, pp. 389-392.) "This occurrence happened due to vandalism." (Ex. R, p. 390.)

Skip Gardella has opined that a substantial wake from a passing large vessel may also have caused the "Lynn" to capsize. (Ex. B, pp. 69-70, 76-77.) However, this also would have been an intervening event not caused in any manner by Balfour Beatty.

The superseding cause of either vandalism or high wake has sufficiently severed any causal nexus between Balfour Beatty's use of the "Lukie" and the sinking of the "Lynn", the "Jane O", the crane and the pumps and relieves Balfour Beatty of all liability associated therewith. See Archer, 538 U.S. at 326-27, 123 S. Ct. at 1470. Either of these superseding causes has rendered Balfour Beatty's use of the "Lukie" such a remote cause of GEC's damages relating to the "Lynn", the "Jane O", the crane and the pumps that Balfour Beatty, as a matter of law, cannot be held liable for

any of these damages, especially given the already remote and tenuous connection between the use of the "Lukie" and the sinking of the other vessels and equipment. Id.

### C. The Record Evidence Shows That Balfour Beatty Exercised Due Care In Operating The "Lukie" Which Was Returned To GEC Afloat And Without Leaks

Balfour Beatty is entitled to summary judgment as to all claims against it because there is no credible, non-speculative record evidence that Balfour Beatty did anything to cause the eventual sinking of the "Lukie". To the contrary, Darrell Brake who captained the "Lukie" for Balfour Beatty and his deck hand, Wayne Javes, have testified that while Balfour Beatty used the "Lukie" it never ran aground, touched bottom, struck any objects, was involved in any accidents, or leaked. (Ex. E, pp. 171, 173-175; Ex. F, pp. 216-217, 225.) Balfour Beatty's proper use of the "Lukie" was confirmed in the report of CNA's surveyor, Doran Podoloff, which was prepared after the November 20, 2001 survey of the "Lukie" and which provides in pertinent part that "It was the opinion of all three surveyors [Doran Podoloff, George Stafford and Michael Collyer] after close examination of the bottom, that **there is no evidence of the tug striking a submerged object or grounding.**" (Ex. T, p. 439, emphasis added.)

It is undisputed that when Balfour Beatty returned the "Lukie" to GEC/NMCI at approximately 11:30 a.m. on October 12, 2001, the vessel was floating and there were no signs of damage to or leakage of the vessel. (Ex. E, pp. 178-179, 186, 191-193; Ex. F, pp. 222-224; Ex. G, pp. 245-246; Ex. O, p. 381.) It is also undisputed that the "Lukie" was still floating after Balfour Beatty's crew left the "Lukie" and NMCI's Tomlinson Bridge project site. Kevin Gallogly, NMCI's employee who boarded and assisted in securing the "Lukie" at the Mobil Oil dock when it first arrived, testified that the "Lukie" was still afloat and not leaking at about 1:00 p.m. when he reboarded the vessel to check its fuel and oil levels.

12

> Q. All right. You didn't notice any water coming into the boat?
>
> A. No.

(Ex. I, p. 282, lines 9-11.)

> Q. Okay. Once you were checking the oil and fuel levels, did you also just take a general look around the Lukie as well?
>
> A. Yeah. You just basically see if, you know, it's still floating **and it was floating fine. You know, it wasn't drafting one side or the other. It was just sitting fine.**

(Ex. I, p. 285, lines 7-13, emphasis added.)

Crispin Tunila another NMCI employee who assisted in tying up the "Lukie" and who reboarded the vessel in the afternoon of October 12, 2001, also testified as follows:

> Q. As far as you could see, was there any water coming into the Lukie?
>
> A. No, there wasn't.
> I couldn't see that well, but I didn't notice any.

(Ex. J, p. 308, lines 7-11.)

Various NMCI employees observed the "Lukie" throughout the afternoon of October 12, 2001, and found it floating well. John Amenta, NMCI's project foreman in New Haven Harbor on October 12, 2001, who directed Balfour Beatty to tie the "Lukie" at the Mobil Oil dock, has testified as follows:

> Q. Okay. When's the last time on Friday when the Lukie was returned, when was the last time during the day that you saw the boat?
>
> A. It was probably like somewhere around 3:00 or 4:00 that I probably glanced over and saw it. I mean, that's as late as I can believe it was there.
>
> Q. Okay. Was there anything unusual when you saw it at that time?

13

      A.    No, no.

(Ex. H, p. 269, lines 4-13.)

Mr. Gallogly has also testified that the "Lukie" was afloat and on its lines at the end of his work day.

      Q.    Do you recall seeing the Lukie before you left the project site?

      A.    Yeah. Because it's right there. Like here's this and here's where all the other activity was. And she was sitting fine, you know.

           Because you got the scuppers on the side of the boat and if anything's getting down toward the water, you could see on the side of the boat if it's listing or doing anything like that.

      Q.    Uh-huh.

      A.    She was sitting fine. You know, didn't really, you know, have a reason to check on it or anything like that. But when we left the Alchemist, she was sitting fine.

(Ex. I, p. 287, line 23, through p. 288, line 11.)

Mr. Tunila also testified that he could see the "Lukie" at the end of his work day and had no reason to believe it was sinking. (Ex. J, p. 309.) Further, it has been reported that Frank Post, NMCI's superintendent, observed the "Lukie" at 11:00 p.m. on October 12, 2001, and it was still floating properly on its lines. (Ex. S, p. 433; Ex. W, p. 449.)

The record evidence shows that Balfour Beatty used due care in operating the "Lukie", that the vessel was returned to GEC afloat and not leaking and that it remained afloat on October 12, 2001 after the vessel was returned. Balfour Beatty, therefore, is entitled to summary judgment as to all claims against it because there is no record evidence that Balfour Beatty did not exercise due care in the operation of the "Lukie".

**D.  GEC Had Reassumed Possession, Command And Control Of The "Lukie" At The Time It Sank And, Therefore, GEC Is Responsible for Any Damages Related To Its Sinking**

Even if it could be said that Balfour Beatty was the owner *pro hac vice* of the "Lukie" while in its possession, GEC reassumed the duties and liabilities of ownership of the vessel when it reassumed possession, command and control of the vessel upon its return on October 12, 2001. Guzman v. Pichirilo, 369 U.S. 698, 700, 82 S. Ct. 1095, 1096-97, 8 L. Ed. 2d 205 (1962) (explaining that "[t]o create a demise the owner of the vessel must completely and exclusively relinquish possession, command and navigation thereof to the demisee.") It is undisputed that GEC/NMCI directed Balfour Beatty to return the "Lukie" to NMCI's Tomlinson Bridge project so that it could reassume possession, custody and control of the vessel. GEC's and NMCI's Vice President, Gary Wetmore, testified:

> Q.   Okay. What do you recall about Balfour Beatty's return of the vessel?
>
> A.   Buddy McIntosh called me. He said that they were done with the vessel, they were going to return it to Norwalk. And where they were working was very, very close to New Haven, closer to New Haven than Norwalk. And I said, "Well, just return it to New Haven," because I needed to bring a barge from New Haven to Norwalk and it would save them a few hours of running and it would save me a few hours of running.
>
> Q.   Okay.
>
> **A.   So I was just going to assume control of it from them.**

(Ex. G, p. 242, lines 7-20; see also Ex. B, p. 56, lines 5-14.)

Further record evidence that GEC reassumed full control, custody and ownership of the "Lukie" on October 12, 2001 is found in GEC's deletion and addition of the vessel under its marine insurance policy. When Balfour Beatty took possession of the "Lukie" on September 4, 2001, GEC

15

deleted the vessel from coverage under the policy. (Ex. B, pp. 62-63; Ex. M, p. 373.) When Balfour Beatty returned the "Lukie" on October 12, 2001, GEC added the vessel back to its coverage. (Ex. B, p. 64; Ex. M, p. 374.) Skip Gardella explained why this was done:

> Q. Okay. So is it correct in understanding that if, say, Gardella or Norwalk Marine was to rent a vessel that it's going to be taken off of your insurance policy for the period of time that the vessel is rented?
>
> A. Exactly.
>
> **Q. And when is it going to go back on?**
>
> **A. When we have full care, control, and custody.**

(Ex. B, p. 63, lines 14-22, emphasis added.) On October 12, 2001, when GEC reassumed full care, control and custody of the "Lukie", GEC added the vessel back to its insurance policy.

It cannot be genuinely disputed that GEC reassumed full possession, care, control and custody of the "Lukie" on October 12, 2001 upon Balfour Beatty's redelivery of the vessel. Therefore, GEC, not Balfour Beatty, was the owner of the "Lukie" when it sank on October 13, 2001 and is responsible for its own damages in this matter. Guzman, 369 U.S. at 699-700, 82 S. Ct. at 1096-97.

### E. <u>Balfour Beatty Is Not Liable To GEC Because The "Lukie" Sank Due To Ordinary Wear And Tear And Lack Of Maintenance</u>

The charterer of a vessel "is responsible for any damage caused by his negligence, **except for ordinary wear and tear.**" Dow Chemical Co. v. Texaco Refining and Marketing, Inc., 887 F. Supp. 853, 864-65 (E.D. Va.1995) citing to Seaboard Sand & Gravel Corp. v. Moran Towing Corp., 154 F.2d 399, 402 (2d Cir. 1946), and 2B Benedict on Admiralty § 51, at 3-3. "Ordinary wear and tear" has been defined as "damage to a vessel due to gradual deterioration which results from use, lapse of time, and the operation of the elements." Dow Chemical, 887 F. Supp. at 865, quoting

Alex L. Parks & Edward V. Cattell, Jr., The Law of Tug, Tow & Pilotage 902 (3d ed. 1994) (citing The Ruth, 20 F.2d 314 (3d Cir. 1927)). The age of the vessel is another factor "useful in defining normal wear and tear." Dow Chemical, 887 F. Supp. at 866, quoting Otto Candies, Inc. v. McDermott Int'l, Inc., 600 F. Supp. 1334, 1343 (E.D. La. 1985).

While there is no record evidence showing that Balfour Beatty did anything to cause the "Lukie" to sink, there is ample evidence that the "Lukie" sank because of ordinary wear and tear that was excacerbated by its deteriorated condition and lack of maintenance. When GEC purchased the "Lukie" (which was built in 1942) it was in poor condition and its hull was thin in many places, suffered from wastage, and had a number of doubler plates attached to it. (Ex. A, p. 2 at ¶7.) The vessel had not been hauled, hull sand blasted and painted since 1997. (Ex. A, p. 2 at ¶7.)

The deteriorated condition of the "Lukie" was confirmed at its post-sinking survey where it was found that wastage caused the sinking of the tugboat. One marine surveyor has reported that:

> A resurvey was held on the "LUKIE" on November 20, 2001 at Fairhaven Shipyard, Inc. in Fairhaven, MA. Present were George Stafford, marine surveyor representing Balfour Beatty, the people that chartered the "LUKIE" from Norwalk Marine; Michael Collyer, representing Marine Safety Consultants and the undersigned surveyor.
>
> ...
>
> There was an oblong hole in the bottom approximately 1-1/2" to 2". The opening is not a hole in the bottom from a thru hull but a separation of the steel plates. **It was the opinion of all three surveyors after close examination of the bottom, that there is no evidence of the tug striking a submerged object or grounding. We all felt that this is an area of the hull that eventually rusted through form [sic] stray current corrosion.**
>
> An ultrasonic thickness gauge was applied to the hull and the steel hull measured less than .250th. Some areas were as low as .148th.
>
> It was the opinion of all surveyors in attendance that the hull should have a thickness of ½" to 7/16".

> The zinc anodes that were secured to the hull on both sides are all missing. The hull was found to be pock marked by stray current corrosion due to the absence of zinc anodes. There were a number of patches in the hull and some large pieces of steel welded onto the hull.

(Ex. S, pp. 438-439, emphasis added.)

Another surveyor reported that:

> On November 20, 2001 the Tug "LUKIE" is moved by another tug to the travel lift well of Fairhaven Shipyard, Fairhaven, Massachusetts. At 1300 hours the tug is hauled out. The undersigned and Marine Surveyor, Dick Podoloff are attending this examination. Later, we are met by Mr. Dave [sic] Collyer Marine, Investigator for Marine Safety Consultants, Fairhaven, Massachusetts.
>
> ...
>
> In general, the underside of the "LUKIE" appears 'pock marked' with deep corrosion pits. We can not find a single zinc anywhere on the bottom....Hole measures 2" x .75" in an oval shape. The metal is very thin around this hole. We take thickness measurements with ultrasonic thickness meter by Cygnus. Measurements range from .175 to .180 near the hole. We can not locate any section on the bottom where measurements are more than .241....We find many old doubler plates welded on in random patterns over each other.
>
> CAUSE OF LOSS
>
> Based on our examinations of the vessel **we are of the opinion that wastage of the metal from corrosion is the proximate cause of the hole and subsequent sinking. This is due to gradual deterioration from corrosion not from any sudden or accidental occurrence.** The lack of zincs on the bottom and overall lack of maintenance may have accelerated the corrosion process. We are in agreement with Mr. Dick Podoloff, Marine Surveyor, on this cause of loss.

(Ex. T, pp. 436-437, emphasis added.) CNA then declined GEC's/NMCI's claim on the "Lukie" because "the opening in the hull which resulted in the vessel sinking was determined to be wear and tear, or gradual deterioration evidently caused by improper maintenance." (Ex. U, p. 446.)

There is no non-speculative record evidence that Balfour Beatty did anything to cause the

18

"Lukie" to sink. To the contrary, the record evidence shows that the tugboat sank because of ordinary wear and tear and the vessel's deteriorated, unseaworthy condition. Balfour Beatty, therefore, is entitled to summary judgment because, as a matter of law, it cannot be held responsible for damage to the "Lukie" caused by ordinary wear and tear, especially after it had been returned to GEC who had reassumed complete ownership and control over the vessel. See Dow Chemical, supra.

## V.    CONCLUSION

Balfour Beatty is entitled to summary judgment as to all claims asserted against by GEC. Balfour Beatty is entitled to summary judgment that it was not the proximate cause of any damages incurred by GEC as a result of the sinking of the barge "Lynn", the pushboat "Jane O", the crane and the pumps. The sinking of these vessels and equipment, nine days after Balfour Beatty returned the "Lukie" and before they could even be used to raise the tugboat, simply was not a foreseeable risk created by Balfour Beatty's use of the "Lukie". Moreover, the sinking of the other vessels and equipment was caused by the intervening, superseding cause of vandalism (or possibly of high wake). This serves to completely sever the already remote and tenuous connection between Balfour Beatty's use of the "Lukie" and the sinkings of the "Lynn", "Jane O", crane and pumps and eliminates Balfour Beatty's liability therefore.

Balfour Beatty is also entitled to summary judgment as to all of the GEC's claims because there is no credible, non-speculative record evidence suggesting that Balfour Beatty did anything to cause the sinking of the "Lukie". To the contrary, the record evidence shows that Balfour Beatty used the tugboat with due care and that the "Lukie" sank, while under the reassumed ownership, possession, custody and control of GEC, due to wastage and its deteriorated condition.

Respectfully submitted this 22nd day of September, 2004.

_____
STEPHEN W. PICKERT
Federal Bar No. ct24325
ANTHONY R. KOVALCIK
Federal Bar No. ct19170
MOYE, O'BRIEN, O'ROURKE,
 PICKERT & MARTIN, LLP
800 South Orlando Avenue
Maitland, Florida 32751
(407) 622-5250
(407) 622-5440 (fax)

Attorneys for Balfour Beatty Construction, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that Balfour Beatty Construction, Inc.'s Memorandum of Law in Support of its Motion for Summary Judgment has been furnished by overnight delivery on this 22nd day of September, 2004 to Edward M. Rosenthal, Esq., Willcutts Law Group, LLC, Capitol Place, 21 Oak Street, Suite 602, Hartford, Connecticut 06106-8002.

_____
STEPHEN W. PICKERT
Federal Bar No. ct24325
ANTHONY R. KOVALCIK
Federal Bar No. ct19170
MOYE, O'BRIEN, O'ROURKE,
 PICKERT & MARTIN, LLP
800 South Orlando Avenue
Maitland, Florida 32751
(407) 622-5250
(407) 622-5440 (fax)

Attorneys for Balfour Beatty Construction, Inc.