# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARDELLA EQUIPMENT CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CASE NUMBER: 3:02CV2076(AHN) |
| v. ) | |
| ) | |
| BALFOUR BEATTY CONSTRUCTION, INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |
| and ) | |
| ) | SEPTEMBER 22, 2004 |
| BALFOUR BEATTY CONSTRUCTION, INC., ) | |
| ) | |
| Counterclaim Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| GARDELLA EQUIPMENT CORPORATION, ) | |
| ) | |
| Counterclaim Defendant. ) | |
| ) | |
| and ) **BALFOUR BEATTY CONSTRUCTION, INC.'S** |
| ) **LOCAL RULE 56(a)1 STATEMENT** |
| BALFOUR BEATTY CONSTRUCTION, INC., ) | |
| ) | |
| Third Party Plaintiff, ) | |
| v. ) | |
| ) | |
| NORWALK MARINE CONTRACTORS, INC., ) | |
| ) | |
| Third Party Defendant. ) | |

Defendant, Balfour Beatty Construction, Inc. ("Balfour Beatty"), by and through its undersigned counsel, pursuant to D. Conn. L. Civ. R. 56(a)1, and in support of its Motion for Summary Judgment, hereby submits its statement of material facts as to which there are no genuine issues to be tried. Balfour Beatty has separately filed, in two volumes, the exhibits it has cited to in

this Statement.

**Statement Of Facts As To Which There Are No Genuine Issues To Be Tried**

1. The tugboat "Lukie" was built in 1942. (Ex. A, p. 2 at ¶7; Ex. S, p. 433.)[1]

2. From 1983 to May of 2001, the "Lukie" was owned by Local Towing, Inc. located in East Norwalk, Connecticut. (Ex. A, p. 2 at ¶5.)

3. Gardella Equipment Corporation ("GEC") is located at 111 Harbor Avenue, Norwalk, Connecticut, and offers for rent such items as barges, cranes and tugboats. (Ex. B, pp. 12-13, 20-21.)

4. On May 4, 2001, Local Towing, Inc. sold the tugboat "Lukie", the tugboat "Tom-Cat", the dredge barge "302" and the tugboat "Jimmie-Sez" to GEC for $120,000. (Ex. K, pp. 311-312; Ex. L, pp. 313-314.)

5. At the time of its sale to GEC, the "Lukie" was in poor condition. Its hull suffered from wastage, was thin in many places and had a number of doubler plates attached to it. The "Lukie" had not been hauled, hull sand blasted and painted since the fall of 1997. (Ex. A, p. 2 at ¶7.)

6. Because of its poor condition, the "Lukie" had been used only sparingly by Local Towing in the 2 to 3 years prior to its sale to GEC. (Ex. A, p. 2 at ¶8.)

7. At the time of its sale to GEC, the tugboat "Lukie" was not fit for heavy use or for use as a tugboat for charter. (Ex. A, p. 3 at ¶9.)

8. Norwalk Marine Contractors, Inc. ("NMCI") is in the business of marine construction. (Ex. B, pp. 17-18.)

---

[1] Citations to "Ex." refer to the exhibits that have been separately filed in two volumes. The exhibits are paginated consecutively from page 1 through page 448 and page references in this Statement are to the consecutive pagination. Volume I contains Exhibits A through F (pages 1

9.  NMCI is located at the same address as GEC, has the same president as GEC, Louis "Skip" Gardella, and generally has the same management as GEC. (Ex. B, pp. 13-14, 18-20.)

10. GEC is basically a holding company for equipment that NMCI uses on its projects. (Ex. B, pp. 21-22.)

11. On May 4, 2001, GEC and NMCI added the "Lukie" to their joint maritime insurance policy with MOAC, a CNA Maritime Division, policy number H 0863239, underwritten by Continental Insurance Company (the "Insurance Policy"). (Ex. M, p. 359.)

12. GEC and NMCI valued the "Lukie" at $60,000 in the Insurance Policy. (Ex. B, p. 39; Ex. M, p. 359.)

13. Balfour Beatty Construction, Inc. ("Balfour Beatty") was the general contractor on the Sikorsky Bridge Reconstruction project (the "Project"). (Ex. C, p. 101.)

14. In August 2001, Balfour Beatty's Superintendent on the Project, Buddy McIntosh, made several telephone calls to Skip Gardella to gather information for his superiors regarding rental of a tugboat for use on the Project. (Ex. C, pp. 103-104; Ex. D, pp. 118, 129-136.)

15. Buddy McIntosh did not have the authority to enter into a contract for the rental of a tugboat on the Project. (Ex. C, pp. 100, 103; Ex. D, p. 126.)

16. Only Balfour Beatty's Project Manager, Dale Smith, had the authority to enter into a contract for the rental of a tugboat on the Project. (Ex. C, pp. 100, 103; Ex. D, p. 126.)

17. The only document concerning Balfour Beatty's inquiry as to the use of a tugboat on the Project was an August 29, 2001 fax from Skip Gardella to Buddy McIntosh regarding the tugboat "Lukie". (Ex. C, p. 106; Ex. N, p. 380.)

18. The August 29, 2001 fax was not signed by either GEC or Balfour Beatty. (Ex. B,

---

through 234) and Volume II contains Exhibits G through W (pages 235 through 449).

p. 58; Ex. N, p. 380.)

19. Balfour Beatty entered into an oral agreement with GEC for use of the tugboat "Lukie" on the Project. (Ex. D, pp. 134-137; Ex. P, p. 382.)

20. GEC chose not to submit a written agreement to Balfour Beatty regarding its rental of the "Lukie". (Ex. B, pp. 49-52.)

21. On September 4, 2001, Balfour Beatty took possession of the "Lukie" at NMCI's yard in Norwalk, Connecticut. (Ex. D, p. 146; Ex. O, p. 381.)

22. On September 4, 2001, GEC and NMCI deleted the "Lukie" from coverage under the Insurance Policy. (Ex. B, pp. 62-63; Ex. M, p. 373.)

23. Neither Balfour Beatty nor GEC conducted an on-hire survey of the "Lukie". (Ex. B, pp. 44, 46-47; Ex. D, p. 162.)

24. The "Lukie" was operated by Darrel Brake (Captain) and Wayne Javes (deck hand) of Balfour Beatty. (Ex. F, p. 203; Ex. O, p. 381.)

25. Balfour Beatty used the "Lukie" on the Project off and on for the next five to six weeks on the Housatonic River with due care and without incident. (Ex. E, p. 170; Ex. O, p. 381.)

26. During Balfour Beatty's use of the "Lukie", the vessel was never run aground, it never touched bottom, it never struck any objects, it was not involved in an accident and it did not leak. (Ex. E, pp. 171, 173-175; Ex. F, pp. 216-217, 225; Ex. S, p. 437; Ex. T, p. 439.)

27. When finished using the vessel, Buddy McIntosh contacted Gary Wetmore, GEC's and NMCI's Vice President, regarding redelivery of the "Lukie" to GEC in Norwalk. (Ex. B, p. 56; Ex. D, p. 155; Ex. G, p. 242.)

28. Gary Wetmore directed Buddy McIntosh not to return the "Lukie" to Norwalk but to redeliver the tugboat to New Haven Harbor instead. The "Lukie", at the time, was closer to New

4

Haven than Norwalk and NMCI needed the "Lukie" to push the barge Hughes 853 from its Tomlinson Bridge project site in New Haven Harbor to its yard in Norwalk for use on another of its projects. (Ex. B, p. 58; Ex. D, p. 155; Ex. G, pp. 242-244; Ex. H, p. 265.)

29.     Accordingly, on October 12, 2001, Darrell Brake and Wayne Javes of Balfour Beatty returned the "Lukie" to GEC/NMCI in New Haven Harbor. (Ex. B, p. 66; Ex. O, p. 381; Ex. P, p. 382.)

30.     Prior to its arrival, John Amenta, NMCI's project foreman on the Tomlinson Bridge project, was informed that the "Lukie" was to be returned to New Haven Harbor and was instructed to tell Balfour Beatty where to place the vessel. (Ex. H, pp. 256, 258-259.)

31.     Upon the "Lukie's" arrival in New Haven Harbor at approximately 11:30 a.m. on October 12, 2001, John Amenta directed Balfour Beatty to park the "Lukie" next to another vessel which was docked at the Mobil Oil dock near the Tomlinson Bridge that NMCI had permission to use. (Ex. B, p. 60; Ex. E, pp. 176, 178; Ex. H, pp. 258-262; Ex. I, p. 279; Ex. O, p. 381.)

32.     NMCI employees Kevin Gallogly and Crispin Tunila assisted Darrell Brake and Wayne Javes in tying up and securing the "Lukie" to another vessel at the Mobil Oil dock. (Ex. E, pp. 178-179, 185-186, 192; Ex. F, pp. 219-220; Ex. I, pp. 279-280; Ex. J, pp. 301-304; Ex. O, p. 381.)

33.     NMCI employees Kevin Gallogly and Crispin Tunila boarded the "Lukie", inspected the vessel and found no evidence of leakage or damage. (Ex. E, pp. 178-179, 186, 191-193; Ex. F, pp. 222-224; Ex. G, pp. 245-246; Ex. O, p. 381.)

34.     At around noon, Kevin Gallogly and Crispin Tunila then transported Darrell Brake and Wayne Javes to shore. Gallogly and Tunila had lunch and Brake and Javes were met by Buddy McIntosh who transported them back to Balfour Beatty's project site. (Ex. I, p. 280; Ex. J, p. 304-

305.)

35. After the "Lukie" was secured in New Haven on October 12, 2001, and Balfour Beatty's crew left NMCI's project site, GEC/NMCI reassumed complete possession of and control over the vessel. (Ex. B, pp. 63, 66; Ex. G, p. 242; Ex. M, p. 373.)

36. After lunchtime, John Amenta directed Kevin Gallogly to check the fuel and oil levels of the "Lukie" in preparation for NMCI's use of the vessel to push the barge Hughes 853 to Norwalk. (Ex. I, p. 280; Ex. J, pp. 305-306.) Kevin Gallogly asked Crispin Tunila to assist him. (Ex. J, p. 306.)

37. At approximately 1:00 p.m., Kevin Gallogly and Crispin Tunila reboarded the "Lukie" and Mr. Gallogly checked the fuel and oil levels of the vessel. (Ex. I, pp. 280-281; Ex. J, pp. 305-307.)

38. Neither Kevin Gallogly nor Crispin Tunila noticed any water entering the "Lukie" nor anything unusual about the vessel which was floating and sitting properly in the water. (Ex. I, pp. 281-282, 285; Ex. J, p. 308.)

39. Subsequent observations of the "Lukie" by NMCI employees between 3:00 p.m. and 4:00 p.m. on October 12, 2001 showed that the tugboat was still floating properly at the Mobil Oil dock. (Ex. H, p. 269; Ex. I, pp. 287-288; Ex. J, p. 309.)

40. It was reported that NMCI's superintendent, Frank Post, observed the "Lukie" at approximately 11:00 p.m. on October 12, 2001, and the vessel was still floating on its own lines. (Ex. S, p. 433; Ex. W, p. 449.)

41. On October 12, 2001, GEC and NMCI added the "Lukie" back to its coverage under the Insurance Policy. (Ex. B, p. 64; Ex. M, p. 374.)

42. On the morning of October 13, 2001, GEC and NMCI found that the "Lukie" had

6

sunk. (Ex. H, pp. 265-267; Ex. S, p. 433.)

43. The following week, GEC and NMCI mobilized the barge "Lynn", the pushboat "Jane O", a crane and two pumps as part of a plan to salvage the "Lukie". (Ex. B, pp. 27-28, 67; Ex. I, p. 289.)

44. On October 21, 2001, the barge "Lynn", the pushboat "Jane O", the crane and the pumps were also found sunk in New Haven Harbor before any attempt was made to use them to raise the "Lukie". (Ex. B, pp. 27, 67-68, 71; Ex. G, pp. 247-250; Ex. I, p. 289; Ex. R, pp. 385, 396-397; Ex. V, pp. 447-448.)

45. Balfour Beatty had no connection with the "Lynn", the "Jane O", the crane and the pumps. (Ex. B, p. 71; Ex. D, p. 161.)

46. The "Lynn", the "Jane O", the crane and the pumps were raised first and this was accomplished by November 2, 2001. (Ex. R, pp. 385-389; Ex. S, p. 434.)

47. After one failed attempt to raise the "Lukie" with a double sling, the "Lukie" was eventually raised on November 5, 2001. (Ex. B, p. 68; Ex. R, p. 392; Ex. S, p. 434.)

48. CNA retained two marine surveyors, Doran Podoloff of Doran M. Podoloff, Marine Surveyor, Inc. and Michael Collyer of Marine Safety Consultants, Inc., to investigate the circumstances surrounding the sinkings of the "Lukie", the "Lynn", the "Jane O", the crane and the pumps. (Ex. R, pp. 384, 395; Ex. U, p. 445.)

49. BBCI also retained a marine surveyor, George Stafford of Stafford Marine Service, L.L.C., to investigate the circumstances surrounding the sinking of the "Lukie". (Ex. R, p. 395; Ex. S, p. 432.)

50. On November 6, 2001, GEC pushed the "Lukie" across the river and left it at KC Metals' scrap yard. (Ex. B, pp. 72-73; Ex. R, pp. 393-394, 415; Ex. S, p. 434.)

51.     On November 7, 2001, Doran Podoloff and George Stafford performed a joint survey of the "Lukie" at KC Metals' scrap yard. (Ex. R, p. 394; Ex. S, p. 435; Ex. T, p. 438.)

52.     It was nearly impossible to perform the survey because the "Lukie" was found stranded on the beach of KC Metals' scrap yard, at low tide, resting on its hull and leaking oil. (Ex. R, p. 394; Ex. S, p. 436.)

53.     The "Lukie" was determined to be a constructive total loss because repairs to the vessel would exceed its $60,000 value. (Ex. Q, p. 383; Ex. R, p. 394; Ex. S, pp. 435, 437.)

54.     On November 8, 2001, the owners of KC Metals' scrapyard demanded that the "Lukie" be removed from its premises because it had become an environmental and navigational liability. (Ex. R, pp. 394, 415; Ex. T, p. 435.)

55.     The "Lukie", therefore, was given to Tucker-Roy Marine Towing & Salvage, Inc. ("Tucker-Roy") in order to tow the tugboat to a shipyard in Fair Haven, Massachusetts for further inspection. (Ex. B, p. 75; Ex. S, p. 436; Ex. T, pp. 438-442.)

56.     On November 16, 2001, when Tucker-Roy arrived at KC Metals to pick up the "Lukie", it was found to be submerged in water to the rails. (Ex. T, p. 438.)

57.     CNA paid Tucker-Roy $2,765.00 to dewater the "Lukie" and an additional $1,000.00 to tow it to Fair Haven shipyard. (Ex. S, p. 436; Ex. T, pp. 438-442.)

58.     On November 20, 2001, a second survey was performed on the "Lukie" by Doran Podoloff and George Stafford at the Fair Haven Shipyard in Fair Haven, Massachusetts. Michael Collyer also joined in on the survey. (Ex. S, pp. 436-437; Ex. T, p. 438.)

59.     The "Lukie" was found to be in poor condition with many areas of its hull consisting of thin metal and in a general deteriorated condition. Maintenance of the vessel was very minimal over the last few years in most all areas. (Ex. S, pp. 436-437; Ex. T, pp. 438-439.)

60. It was also found that the underside of the "Lukie" appeared pock-marked with deep corrosion pits and had no zinc anodes. (Ex. S, p. 436; Ex. T, p. 439.)

61. A number of patches were found on the hull of the "Lukie", as well as some large pieces of steel welded to the hull and many old doubler plates[2] that were welded on in random patterns over each other. (Ex. S, p. 436; Ex. T, p. 439.)

62. There were no signs or evidence of the "Lukie" striking a submerged object or of any impact or of grounding damage anywhere. (Ex. S, p. 437; Ex. T, p. 439.)

63. However, an oblong hole was found in the bottom measuring approximately 1-1/2" to 2". (Ex. S, p. 436; Ex. T, p. 439.)

64. It was concluded that this was an area of the hull that eventually rusted through and that wastage of the metal of the "Lukie" from corrosion was the proximate cause of the hole and subsequent sinking of the vessel. This was due to gradual deterioration from corrosion and not from any sudden or accidental occurrence. (Ex. S, p. 437; Ex. T, p. 439.)

65. The lack of zincs on the bottom and overall lack of maintenance accelerated the corrosion process. (Ex. S, p. 437; Ex. T, p. 439.)

66. On November 26, 2001, CNA denied GEC's/NMCI's claim relating to the sinking of the "Lukie" based on the survey of the vessel by George Stafford, Doran Pudoloff and Michael Collyer. CNA determined that the opening in the hull which resulted in the vessel's sinking was due to wear and tear or gradual deterioration caused by improper maintenance. (Ex. U, pp. 445-446.)

67. CNA declined to pay GEC/NMCI for the loss of the "Lukie" and all related charges incurred in raising the vessel because it was not a peril or fortuitous event which was covered under

---

[2] A "doubler plate" is a piece of steel welded onto the hull of a vessel to cover an opening in the hull

9

the Insurance Policy. (Ex. U, p. 446.)

68.   Surveys were also performed on the barge "Lynn". (Ex. S, pp. 384-431.)

69.   Surveyors Doran Podoloff and George Stafford found that the barge "Lynn" had been broken into and that the barge sank due to vandalism when someone entered the crane that was placed on the barge, started it and drove it off the barge causing the "Lynn" to capsize and eventually submerge along with the crane and the pumps. (Ex. R, pp. 389-390; Ex. S, p. 434.)

70.   When the barge "Lynn" and the crane and the pumps which were upon it sank, the pushboat "Jane O", which was tied to the "Lynn", also sank. (Ex. B, p. 71; Ex. I, p. 289; Ex. R, p. 385; Ex. S, p. 434.)

71.   Skip Gardella, on behalf of NMCI, submitted to CNA a Proof of Loss under the Insurance Policy in connection with the sinking of the barge "Lynn" wherein he stated "under penalty of perjury," that "The barge [Lynn], with equipment aboard including a crane, was discovered sunk on the morning of October 21, 2001. Though we are uncertain as to what Endorsement No. 6 refers to when it calls for comment as to the 'origin' of the loss, we believe that the sinking was caused by vandalism." (Ex. V, pp. 447-448.)

---

or to secure another doubler plate.

Respectfully submitted this 22nd day of September, 2004.

*[signature]*

STEPHEN W. PICKERT
Federal Bar No. ct24325
ANTHONY R. KOVALCIK
Federal Bar No. ct19170
MOYE, O'BRIEN, O'ROURKE,
 PICKERT & MARTIN, LLP
800 South Orlando Avenue
Maitland, Florida 32751
(407) 622-5250
(407) 622-5440 (fax)

Attorneys for Balfour Beatty Construction, Inc.

### CERTIFICATE OF SERVICE

I hereby certify that Balfour Beatty Construction, Inc.'s Local Rule 56(a)1 Statement has been furnished by overnight delivery on this 22nd day of September, 2004 to Edward M. Rosenthal, Esq., Willcutts Law Group, LLC, Capitol Place, 21 Oak Street, Suite 602, Hartford, Connecticut 06106-8002.

*[signature]*

STEPHEN W. PICKERT
Federal Bar No. ct24325
ANTHONY R. KOVALCIK
Federal Bar No. ct19170
MOYE, O'BRIEN, O'ROURKE,
 PICKERT & MARTIN, LLP
800 South Orlando Avenue
Maitland, Florida 32751
(407) 622-5250
(407) 622-5440 (fax)

Attorneys for Balfour Beatty Construction, Inc.