## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GARDELLA EQUIPMENT CORPORATION | ) | 3:02CV2076 (AHN) |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BALFOUR BEATTY CONSTRUCTION, INC., | ) | |
| Defendant | ) | |
| | ) | October 14, 2004 |
| and | ) | |
| BALFOUR BEATTY CONSTRUCTION, INC. | ) | |
| Counterclaim Plaintiff | ) | |
| v. | ) | |
| GARDELLA EQUIPMENT CORPORATION, | ) | |
| Counterclaim Defendant | ) | **GARDELLA EQUIPMENT** |
| and | ) | **CORPORATION'S OBJECTION** |
| | ) | **TO BALFOUR BEATTY'S** |
| BALFOUR BEATTY CONSTRUCTION, INC. | ) | **MOTION FOR SUMMARY** |
| Third-Party Plaintiff | ) | **JUDGMENT** |
| v. | ) | |
| NORWALK MARINE CONTRACTORS, INC. | ) | |
| Third-Party Defendant | ) | |

In opposition to Defendant's Motion for Summary Judgment the plaintiff hereby objects pursuant to Fed. R.Civ.P 56, and L. Civ. R. 56, and in opposition thereto attaches the following memorandum of law, Local Rule 56(a)2 statement, and exhibits A through

L. Because the defendant's motion is not well-taken in law, and the defendant has failed to show that there is no genuine issue of material fact, this Court must deny the defendant's motion.

## BACKGROUND

The within admiralty claim by Gardella Equipment Corporation against Balfour Beatty Construction, Inc. sounds in six counts for breach of contract, bailment, negligence, subrogation for salvage costs, subrogation for pollution remediation costs, and indemnity arising out of the October 12-13, 2001 sinking of the tugboat "Lukie", and the October 21, 2001 sinking of the barge "Lynn", pushboat "Jane-O", as well as a crane and two pumps. The plaintiff is an equipment leasing company located in Norwalk, Connecticut that is operated by Norwalk Marine Contractors, Inc., a sister corporation. The defendant chartered the tugboat "Lukie" from plaintiff on September 4, 2001 pursuant to a bareboat charter agreement dated August 29, 2001. The defendant is a construction company engaged in renovations of the Sikorsky Bridge over the Housatonic River near Bridgeport, Connecticut.

The charter agreement was negotiated between Louis "Skip" Gardella, Gardella and Norwalk Marine's president, and Buddy McIntosh, defendant's superintendent on the Sikorsky Bridge project. McIntosh and Gardella were well acquainted with each other, McIntosh having worked for Norwalk Marine on two different occasions, for more than nine years in total. McIntosh indicated to Gardella that Balfour needed a tugboat for use on the Sikorsky Bridge project because its own tugboat was undergoing

repairs. The defendant needed the "Lukie" to move barges on the Housatonic River in connection with the Sikorsky Bridge project. McIntosh was familiar with the "Lukie" from working in the Connecticut marine construction industry for many years and from working for Gardella (the "Lukie" was previously owned by Local Towing, Inc. which was owned by Gardella's uncle). McIntosh was aware that the "Lukie" was an older boat, and that it was in need of aesthetic work.

The "Lukie" had been purchased by the plaintiff some six months prior to defendant's chartering her. During that time period, the plaintiff inspected the "Lukie" and made necessary repairs to her in order to ensure that she was in an operable condition.

The negotiation for the "Lukie" involved several phone conversations between McIntosh and Gardella, and a letter confirming the details of the transaction was faxed from Gardella to the defendant on August 29, 2001. Thereafter, on September 4, 2001, McIntosh and his subordinates, Darrell Brake and Wayne Javes, took possession of the "Lukie" at plaintiff's yard in Norwalk. McIntosh's subordinates proceeded to inspect the "Lukie" and finding no problems, sailed the "Lukie" to the Sikorsky Bridge. When McIntosh, Javes and Brake took possession of the "Lukie" on September 4, 2001, they looked it over and determined that it was in satisfactory condition for the purposes they needed it.

The defendant used the "Lukie" until October 12, 2001. During the time that the defendant had the "Lukie', the defendant had no problems or difficulties with it save for a single instance in which the engine did not immediately start (the problem was rectified

within minutes by the defendant). The plaintiff did not provide a crew or supplies for the "Lukie" during the defendant's charter of it. The defendant provided its own crew, which consisted of Brake as the sole captain and Javes as the deck hand. No employees, agents, or officers of plaintiff or Norwalk Marine were on the "Lukie" during this period of time. Furthermore, at no time did plaintiff put any limitations on the manner in which the defendant could utilize the "Lukie." Not once during this time period had the defendant contacted the plaintiff to indicate that there were any problems associated with the "Lukie." To the contrary, the defendant's construction superintendent, McIntosh, testified that having the "Lukie" helped to keep their project moving along.

On or about October 11, 2001 McIntosh called Norwalk Marine's vice-president, Gary Wetmore, to indicate that the defendant no longer needed the "Lukie" and wanted to return her. Wetmore asked McIntosh to have the "Lukie" returned to New Haven harbor instead of Norwalk as it was closer for the defendant and more convenient for the plaintiff as the "Lukie" was needed to transport a barge there.

When the "Lukie" arrived in New Haven harbor on October 12, 2001 several Norwalk Marine employees were present working on an unrelated project. When the "Lukie" came into the harbor, these employees assisted the defendant's employees in tying the "Lukie" up to the dock. The Norwalk Marine employees were construction workers, and were told by Wetmore to check the fuel and oil levels on the "Lukie" so that Wetmore would know whether the "Lukie" required fueling before making a trip the following day to tow the barge. These employees were not authorized,

4

knowledgeable or capable of performing the inspection or conducting an underwater survey. No inspection or survey took place at that time.

Wetmore arranged for John Amenta, a Norwalk Marine employee and certified diver, to accompany him to the harbor the following day, October 13, 2001, to perform the off-hire survey of the "Lukie." Of primary concern were the hull and the propeller. Inspection of the hull and propeller was not possible except by taking the "Lukie" out of the water, or by underwater examination.

On October 13, 2001 at 6:30 a.m., Wetmore and Amenta arrived to perform the survey on the "Lukie" when they found the "Lukie" sunk and leaking oil into the water. Thereafter, the plaintiff mobilized its other assets to raise the "Lukie" from the bottom of New Haven harbor. The plaintiff's vessels "Lynn", "Jane O", a crane and two pumps were involved in the salvage of the "Lukie" when they were found sunk in New Haven harbor on October 21, 2001. The cause of the sinking of these vessels has never been determined.

After all the vessels were raised, an inspection of the "Lukie" was undertaken by Michael Collyer, a marine surveyor retained by the plaintiff's insurance carrier. Collyer found a two-inch diameter hole on the "Lukie's" hull; in addition, he noted that on the bottom of the "Lukie" there were areas of barnacles that were missing consistent with the hull scraping the bottom of the riverbed or shoal. Collyer determined that hole was caused by an outside force, and not by corrosion or lack of maintenance.

## LEGAL ARGUMENT

### FACTS AND EXHIBITS OFFERED BY DEFENDANT IN SUPPORT OF ITS MOTION ARE INADMISSIBLE AND MUST NOT BE CONSIDERED BY THIS COURT

The principles governing admissibility of evidence do not change on a motion for summary judgment. Fed. R. Civ. P. 56(e) provides that affidavits in support of and against summary judgment "shall set forth such facts as would be *admissible in evidence.*" *Risking v. Wyatt Co.*, 125 F.3d 55, 66 (2$^d$ Cir. 1997); *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 175-76 (5th Cir. 1990). Authentication is a condition precedent to the admissibility of an exhibit submitted in support of a summary judgment motion, and this condition is only satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Fed. R.Evid. §901(a). Courts have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment. *See Barlow v. Connecticut*, 319 F.Supp. 2d 250, 257 (D.Conn. 2004) where Judge Eginton held that documents submitted in support of a summary judgment motion must be properly authenticated as submitted regardless of whether or not they can be authenticated later on at trial. See also *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).

In support of its motion, the defendant has provided the Court with a number of exhibits that would not be admissible at trial, and even if they could be admissible later on at trial, they are not sufficient to support a summary judgment motion due to the failure to authenticate them. Specifically, the defendant has provided the Court with two reports from Mr. Doran Podoloff, who died prior to the parties being able to depose

him (Defendant's exhibits R and T).  Mr. Podoloff was a marine surveyor who was

hired by an insurance company to adjust the loss occasioned by the sinking of the

"Lukie."  In addition to the fact that Mr. Podoloff died without his deposition being

taken, his reports are rife with hearsay statements that could never be admissible at

trial.  Additionally, the reports from George Stafford (Defendant's exhibit S) must be

disregarded as they are uncertified, and contain inadmissible hearsay.  Stafford is a

marine surveyor who was hired by the defendant, and he is alive and has been

deposed.  The defendant presumably could have submitted an affidavit from Stafford

or a copy of his sworn deposition testimony.  Having failed to do either, the defendant

cannot rely on an uncertified copy of Stafford's report which contains statements

attributable to others who have not given sworn testimony.  *Barlow*, supra at 257; see

also *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n.17, 90 S.Ct. 1598, 26 L.Ed.2d 142

(1970) holding that unsworn statements are not sufficient to defeat a motion for

summary judgment.

        The letter from CNA Insurance (Defendant's exhibit U) must be rejected for the

reasons that it is not an authenticated report, and it contains inadmissible hearsay

(expert conclusions and hearsay statements from the Podoloff reports).  Unsworn

statements from the defendant's employees (Buddy McIntosh and Darrell Brake)

(Defendant's exhibits O and W) cannot be considered by this Court as competent

evidence to support a summary judgment motion.  *Barlow*, supra at 259.  Although

these employees provided sworn deposition testimony, the defendant is nonetheless

relying improperly upon their unsworn statements.  Finally, the unauthenticated letters

and insurance policies from the plaintiff's insurance carrier and broker (Defendant's exhibits M, Q and U) as well as the must also be excluded from this Court's consideration.

Even if the these flawed exhibits were fully accepted by the Court, they only serve as support for the defendant's position on fact claims that are in dispute, as more fully developed below. Where these incompetent exhibits are necessary for the defendant to establish its fact claims, however, there is a failure in the first instance by the defendant to properly support its factual contentions relative to its Motion. Where such is the case, the Court need not go further in its analysis of whether the defendant has met its burden to support its Motion.

## DEFENDANT'S CHARTERING OF THE "LUKIE" CONSTITUTED A BAILMENT, AND THE DAMAGE TO THE "LUKIE" WAS CAUSED DURING THE BAILMENT RENDERING THE DEFENDANT LIABLE FOR DAMAGES

A bailment is created when a person delivers personal property to another for some particular purpose with an express or implied contract to redeliver the property when the purpose has been fulfilled. *The Detroit Institute of Arts Founders Society v. Rose*, 127 F.Sup.2d 117 (Conn. 2001). See also *Matzke v. ACSYS, Inc.*, 32 Conn.L.Rptr. 438 at *2 (Conn.Super. 2002). A bailment is "a delivery of goods in trust, upon a contract, express or implied, that the trust shall be faithfully executed on the part of the bailee." *B.A. Ballou and Co., Inc. v. Citytrust*, 218 Conn. 749, 753 n.2 (1991). A bailment involves the delivery of the thing bailed into the possession of the bailee, under a

contract to return it to the owner according to the terms of the agreement. Thus in *On Site Energy Corporation v. Sperry Rand Corporation*, 5 Conn.App. 326, 330-32 (1985) the Court held that a bailment was created when electric generating equipment was placed in lessee's plant maintained by lessor. A written contract is not necessary to create a bailment. *Perry v. Stevenson*, 1994 WL 547677 at *1 (Conn.Super. 1994)(West, J.).

In the within matter, the "Lukie" was chartered by the defendant on September 4, 2001 and this charter constituted a bailment. When the defendant's employees McIntosh, Brake, and Javes took possession of the "Lukie" on September 4, 2001 and sailed it out of plaintiff's marina, the "Lukie" left the plaintiff's possession and a bailment was created in the "Lukie." The defendant was in exclusive possession of the "Lukie" for the entire charter period (September 4, 2001 to October 12, 2001), and the defendant through its employees operated the "Lukie" exclusively without any assistance or input or interference from the plaintiff.

The defendant attempts to deny liability by arguing that it used due care in the operation of the "Lukie" during the charter period. That argument misses the point of the law of bailments. The plaintiff is not required to point out the precise act or omission of duty constituting Balfour's negligence, but only must demonstrate the delivery of the "Lukie" in good condition, and that it was the defendant who failed to return the "Lukie" in the same condition as when it was received. See *Vece v. Vanacore*, 2 Conn.Cir.Ct. 325, 328-329, 198 A.2d 728, 730 (1963) affirming trial court's holding that

damage to boat occurred during bailment.  The court there explained the shifting of the

burden of proof in bailment cases:

> The plaintiff claims that he established a prima facie case of negligence on
> the part of the defendants when it was proved that the bailed boat was
> damaged and that he did not have the burden of satisfying the trial court
> that the conduct of the defendants, as bailees, constituted negligence.  It is
> true…that when a bailee returns the bailed property to the bailor in a
> damaged condition there arises a presumption that the damage was the
> result of the bailee's negligence.  This presumption prevails unless and
> until the bailee proves the actual circumstances involved in the damaging
> of the property…The circumstances which the bailee must prove must be
> something more than those indicating the immediate cause of the damage.
> The proof must go so far as to establish what, if any, human conduct
> materially contributed to the immediate cause.

In *Vece*, the defendants failed to meet the burden, and the court further stated:

> The defendants offered no evidence to explain the circumstances except
> that 'a lot of things' could have caused the damage.  The proof required to
> rebut the presumption of a bailee's negligence is evidence of the
> circumstances causing the damage.  *This evidence cannot be based on
> speculation or conjecture but must be actual proof of the circumstances
> causing damage.*

Id. at 731(emphasis added).  See also *Perry*, supra at *1; *Pinto v. Bridgeport

Mack Trucks, Inc.*, 38 Conn.Supp. 639, 642, 458 A.2d 696, 699 (1983).  See also 8A Am.

Jur. 2d Bailments §§ 241, 233.

Here, the defendant took delivery of the "Lukie" on September 4, 2001 and the

"Lukie" was in a good, seaworthy condition, fit for the purpose that she was chartered

by the defendant.  The defendant needed a tugboat to shift/move barges on the

Housatonic River in connection with its work on the renovation of the Sikorsky Bridge.

During the period of time that the defendant had the "Lukie" (September 4, 2001 to

October 12, 2001), the defendant had no problems with the "Lukie" and it performed as expected and required.

Buddy McIntosh was the defendant's "Superintendent" on the Sikorsky Bridge project, and he testified clearly that the "Lukie" was in a seaworthy condition when the defendant chartered her from the plaintiff.

Q:    Did anyone determine--either the three of you determine whether the Lukie was in acceptable condition for Balfour Beatty to use it for the purposes it intended to use it?

A:    Yes.

Q:    What did you determine?

A:    That we could do the job with it.

(Exhibit C, p.80).

Q:    During the period of time that Balfour Beatty had the Lukie, did you see it every day?

A:    Yes.

Q:    Was there any points in time in which the Lukie was inoperable by Balfour Beatty because of the condition of the Lukie?

A:    No.

Q:    And during the period of time that Balfour Beatty had the Lukie, it was available to use in any manner that Balfour Beatty wanted to use it?

A:    Yes.

Q:    Did you ever have any problems with [it] that would require any kind of maintenance on the Lukie?

A:    Didn't start one time.

(Exhibit C, p.86).

Q:    Other than that one time, are there any other times which there was some kind of problem with the Lukie?

A:    No.

Q:    Did the Lukie in any way slow down Balfour Beatty's work on the Sikorsky Project?

A:    No.

Q:    Did it, in fact, help to speed it up?

A:    It helped to keep it moving.

(Exhibit C, p.87).

Q:    When you obtained the Lukie, when you first obtained it on September 4th when you drove down with Darrell Brake and Wayne Javes, was there anything about the condition of the Lukie that surprised you?

A:    No.

Q:    Was it pretty much in the same condition that you remembered it?

A:    Yes.

Q:    **And that condition would be fine for the purposes that Balfour Beatty intended to use it?**

A:    **Right.**

(Exhibit C, p.89) (emphasis added).

Wayne Javes was the defendant's employee who acted as the 'deck hand' on the "Lukie," and he also testified that the "Lukie" was in a seaworthy condition.

Q:    Did you have any problems using the "Lukie" while you had it?

A:    No.

(Exhibit H, p. 17)

Q:   During the time that Balfour Beatty had the "Lukie, that month plus period of time, did the "Lukie" at any time cause you any problems in trying to use it?

A:   No.

Q:   So Balfour Beatty was able to use the "Lukie" the way that it intended to use it?

A:   Yes. I would say yes.

(Exhibit H, p. 18)

Q:   Was there anything about the "Lukie's" condition when you picked her up that you were surprised about?

A:   **The "Lukie" was seaworthy.  End of statement.**

(Exhibit H, p. 26)(emphasis added).

Darrell Brake, the defendant's employee and the individual who captained the

"Lukie" while the defendant had it, testified the "Lukie's" condition was suitable for

the purposes she was needed by the defendant.

Q:   Other than that one single time, were there any other instances when the "Lukie" was not able to be used by Balfour Beatty in the way it was intended to be used?

A:   Other than the one time I don't remember ever having another problem with it, no.

(Exhibit E, page 18)

Q:   In your opinion--you captained the boat for whatever period of time Balfour Beatty had it, right?

A:   Correct.

Q:   In your opinion, was the vessel in seaworthy condition?

A:   **It did the job [that] we needed to have done.**

Q:    Was the Lukie in such a condition that it wasn't able to do the job or it took longer to do the job than it was obtained to do?

A:    She was a little slow, but she did the job, yeah.

(Exhibit D, p.37)(emphasis added)

Wes Jaynes is the defendant's vice-president of operations for the Northeast region, and he testified that the defendant had no problems associated with chartering the "Lukie" during the charter period.

Q:    To your knowledge, did Balfour Beatty have any problems in utilizing the Lukie for whatever purpose it wanted to?

A:    Not to my knowledge.

Q:    Do you have any information which would lead you to believe that the Lukie was in unseaworthy condition in August through October 2001 prior to it sinking?

A:    No.

(Exhibit L, p.51-52).

From the foregoing, it is crystal clear that at the commencement of the charter the defendant took possession of a boat in seaworthy condition, which was fit for the purposes the defendant requested it. The defendant utilized the vessel uninterrupted for six weeks with nary a problem. Then within hours of the return of the vessel, it is found sunk on the bottom of a harbor with a two inch oblong hole in the bottom of the boat.

The presence of this hole is at best (for the plaintiff) proof that the defendant damaged the vessel during the bailment, or at worst, a factual dispute exists precluding

the entry of summary judgment. The defendant's arguments that the "Lukie" was in a dilapidated condition and that she sank because of a lack of maintenance or ordinary wear and tear are factual issues[1] that cannot be resolved on summary judgment, and additionally are based on exhibits that this Court cannot consider. See arguments supra[2]. The defendant in essence argues that the "Lukie" is an old boat, in a dilapidated condition with a thin hull with a hole in the bottom that predated the charter. How fortuitous for the defendant that the "Lukie" managed to sail without incident under the defendant's tutelage for six weeks, and then within hours of the "Lukie's" being returned, all of a sudden a hole opens up causing the vessel to sink to the bottom of the harbor. Even without Collyer's testimony, or Brake's testimony, or Jave's testimony, or McIntosh's testimony, or Jayne's testimony, common sense and circumstantial evidence should dictate that the defendant's argument is not well-taken in fact or as a plausible explanation of what most probably occurred. Factually, the more likely and reasonable scenario is that the defendant's negligence in operating the "Lukie" during the charter caused the hole that sank her. By operation of the law of bailments, it is the defendant's

---

[1] Michael Collyer, a marine surveyor and Plaintiff's expert herein, will has testified that the "Lukie" sank not due to lack of maintenance or ordinary wear/tear, but rather because of an outside force while in the possession of Defendant. (Exhibit K, p. 44, 64, and 77).

[2] Defendant's citation to the reports of Mr. Podoloff and Stafford are unavailing as the reports are unauthenticated and hearsay. Similarly, the CNA letter as well as the statements from Brake and McIntosh are unauthenticated statements inadmissible in a summary judgment motion. Other than the deposition testimony, which amounts to disputed questions of fact, the only other evidence submitted was the affidavit of George Gardella (Defendant's exhibit A). However, this exhibit offers the Defendant no support for their argument that the "Lukie" sank due to lack of maintenance or ordinary wear/tear because the affidavit is based on knowledge up to the time that George Gardella's company, Local Towing, Inc., sold the vessel to the Plaintiff, April 2001. From April 2001 until the time of the chartering of the vessel to in September 2001, the exhibit is silent as to the condition of the "Lukie". The affidavit does not indicate whether the "Lukie" was completely refurbished or ignored during this time period.

obligation as the bailee to explain the circumstances causing the hole in the "Lukie." The defendant has not met this burden or provided the Court with undisputed facts as required on summary judgment.

## BY OPERATION OF THE "RESCUE DOCTRINE," THE DEFENDANT IS LIABLE FOR THE DAMAGES ASSOCIATED WITH PLAINTIFF'S OTHER VESSELS AND EQUIPMENT LOSS IN EFFORTS TO RESCUE THE LUKIE

By operation of the rescue doctrine/'danger invites peril', the defendant is responsible for the losses associated with the sinking of the "Lynn", "Jane-O", crane and pumps as they were a foreseeable consequence of the attempted rescue of the "Lukie." The rescue doctrine provides that one who is injured in reasonably undertaking a necessary rescue may recover from the person whose negligence or tort created the situation requiring the rescue. In *Christensen v. Georgia-Pacific Corporation*, 279 F.3d 807, 816 (9th. Cir. 2002), the Circuit Court of Appeals reversed the entry of summary judgment, holding that a longshoreman could make a claim for injuries sustained in a rescue against the owner of a boat when the boat was improperly moored to a dock and began drifting out to sea during a storm. The court went on to hold:

> Under the rescue doctrine, which has long been recognized in tort law, the 'foreseeable damages from a wrongful act include damage for the injuries sustained by one who seeks to rescue the person first endangered by that wrongful act. Courts have applied the rescue doctrine to the rescue of property as well as people.

---

The Court is left to speculate as to the condition of the "Lukie" at the time of the chartering. George Gardella's affidavit offers little support to Defendant's arguments.

*Id.* See also *Stewart v. Jefferson Plywood*, 255 Or. 603, 469 P.2d 783, 787 (1970) holding it is well established that one who is injured in an attempt to rescue another person's property which is endangered by the defendant's negligence may recover for the injury. The rescue doctrine stretches the foreseeability limitation to help bridge the proximate cause gap between the defendant's act and plaintiff's injury. The doctrine encourages the rescue of others from peril and immediate danger by holding the tortfeasor liability for any injury to the rescuer on the grounds a rescue attempt is foreseeable. *Clontz v. St. Mark's Evangelical Lutheran Church*, 157 N.C. App. 325, 578 S.E. 2d 654 (2003); *Dillard v. Pittway Corp.*, 719 So. 2d 188 (Ala. 1998). The rescue doctrine was based in part on the reasoning of Judge Cardozo who stated:

> The cry of distress is the summons to relief. The law does not ignore these reactions of the mind in tracing conduct to its consequences. It recognizes them as normal. It places their effects within the range of the natural and probable. The wrong that imperils life is a wrong to the imperiled victim; it is a wrong also to his rescuer. The state that leaves an opening in a bridge is liable to the child that falls into the stream, but liable also to the parent who plunges to its aid... the railroad company whose train approaches without signal is a wrongdoer toward the traveler surprised between the rails, but a wrongdoer also to the bystander who drags him from the path... The risk of rescue, if only it be not wanton, is born of the occasion. The emergency begets the man. The wrongdoer may not have foreseen the coming of a deliverer. He is accountable as if he had...

*Wagner v. International R. Co.*, 232 N.Y. 176, 189, 133 N.E. 437 (1921) cited by *Benoit v. Murphy/Allison/Lane Fiduciary*, 2003 WL 21185788 at *1 (Conn. Super. 2003) holding that decedent's fiduciary liable to rescuer injured in a subsequent accident during the course of the rescue. See also *Schmartz v. Harger*, 22 Conn.

Supp. 308, 171 A.2d 89, 91 (1961) where a homeowner was held liable under *Wagner's* danger invites rescue doctrine for injuries sustained by a voluntary rescuer who fell off a ladder.

In the case at hand, the defendant could reasonably have anticipated that by leaving the "Lukie" in a damaged, leaking condition in New Haven harbor, it created an unreasonable risk of damage not only to the "Lukie", but also to persons or equipment employed in foreseeable attempts to rescue or salvage the vessel. The exact mechanism (whether by vandalism or a wake in the river or operator error or some other factor) of the damage being sustained here (the sinking of the "Lynn," "Jane O", crane and pumps) should be as inconsequential to this Court as it was to the courts in *Christensen* (plaintiff sustaining a back injury while pulling the vessel to the dock), *Benoit* (individual hit by motor vehicle in midst of rescuing defendant whose vehicle hit a tree), or *Schmartz* (neighbor injured in fall off ladder).

Proximate cause is a factual decision that should be decided at trial. *Christensen* at 815. See also *Armstrong v. United* States, 756 F.2d 1407, 1409 (9th Cir. 1985) holding that proximate cause and breach of duty are questions of fact. See also *Gilford v. Haller*, 273 A.D.2d 751, 753, 710 N.Y.S.2d 187, 189 (2000).

## WHEN THE CHARTER HAD TERMINATED WHEN THE "LUKIE" WAS BROUGHT TO NEW HAVEN HARBOR IS A QUESTION OF FACT

The controlling issue is not whether the "Lukie" sank during the bailment and whether the bailment had terminated by that point, but rather whether the "Lukie" was

damaged during the bailment. Even so, the defendant's claims that the "Lukie" sank subsequent to the termination of the bailment is not conceded, and it is a disputed question of fact. The defendant has deliberately disregarded the charter agreement between the parties in order to avoid the effects of the agreement, that the vessel was subject to a before and after survey[3]. At the time the vessel was found sunk in New Haven harbor on October 13, 2003, the off-hire survey had not been performed. Until that survey is performed by Gardella, the vessel was still on charter to Balfour. (Exhibit A). If the incident causing the hole in the "Lukie's" hull occurred during the bailment, then by operation of the law of bailments, the defendant is liable even if the "Lukie" did not sink until after the bailment terminates.

The plaintiff had not resumed possession of the "Lukie" as of the time that she sank, sometime between October 12, 2001 in the afternoon and the morning of October 13, 2001. The plaintiff's only activities related to the "Lukie" on October 12, 2001 consisted of assisting the defendant's employees in tying the "Lukie" up to the dock as a courtesy since they were in the vicinity, and checking the fuel levels. The plaintiff had not yet performed the survey as required by the charter agreement. "...[w]hile the law of bailments implies a general obligation to redeliver or account for the property, the parties are free to stipulate the time, place and manner in which redelivery is to be made. The general principle that the manner of a bailee's redelivery should be made in

---

[3] Credible record evidence indicates that a 'on-hire' survey *was* done by the defendant. Defendant's superintendent McIntosh, made multiple entries in his contemporaneous log book which indicated that a survey was done, that it was backdated for insurance purposes to the date that the defendant took possession of the "Lukie," and that the surveyor's report was expected by the defendant. See Exhibit C, p. 139-40, 142-43, 148, 151-53, 155, and 160.

accordance with the contract stipulations is too well settled to belabor." *On Site Energy Corporation v. Sperry Rand Corporation*, 5 Conn.App. 326, 332, 498 A.2d 121, 124 (1985). See also 8 C.J.S. Bailments §87. Here, the charter agreement provided for a post-charter survey; prior to that survey taking place, the "Lukie" was found sunk as a result of a hole in her hull.

A charter was found to not have terminated at the time that damage to a vessel was discovered in *Vece*, supra at 730. There, the court found that even though the vessel had been removed from a boatyard's premises, and delivered to a temporary dock a quarter of a mile down the river, the bailment did not terminate. The court held that a bailment does not terminate until the bailor resumes possession and custody, and that there the bailor had not done so. Similarly, in *Pacelli v. Butts*, 1999 WL 1212227 at *4 (Conn. Super. 1999), the court held that the bailee's relinquishing of keys to a truck did not terminate a bailment.

More importantly, the court in *Vece* held that it is a question of fact as to when the bailment terminates and when the bailor resumes possession and custody of the boat. *Vece* at 730. Even where the bailment does terminate, if the damage was done while the bailee had possession and custody of the vessel, the bailee is responsible for the ensuing loss. In *Pan-American Petroleum Transp. Co. v. Robins Dry Dock & Repair Co.*, 281 F.97, 106-107 (2d. Cir. 1922), the bailor had resumed possession of its vessel following the defendant making repairs, and the vessel was involved in a collision while it was leaving the defendant's dock. The court found that the defective telegraph system was caused while in the bailment to the defendant.

The defendant relies on CNA insurance documents for the mere fact that the "Lukie" was added back to Gardella's insurance policy is not determinative of whether the "Lukie" was still on charter to Balfour. The return of the "Lukie" to New Haven harbor simply meant that Balfour no longer needed the vessel, and Balfour and Gardella would have to complete the transaction as between them (inspection for damage, payment of the charter fee).

## CONCLUSION

Balfour's Motion for Summary Judgment must be denied as not well taken in law, and as genuine issues of material facts exist precluding the entry of summary judgment. In reviewing the defendant's motion, the Court must disregard the unauthenticated documents submitted in support of the motion. When those documents are set aside, as they must be, then it is clear that the defendant has not satisfied its obligation of coming forward with evidence establishing its entitlement to the entry of summary judgment. Even if the Court were to consider the documentation submitted which is not authenticated, those documents amount to conjecture, speculation, and second-hand knowledge.

As a matter of law, the plaintiff bailed a vessel to the defendant which was in seaworthy condition, and at the end of the bailment, the vessel sank. A presumption is established that the sinking of the "Lukie" was due to the defendant's negligence. To rebut this presumption, the defendant must specifically show to the Court how the "Lukie" came to get a hole in it. Failing to do that, the defendant is liable for the

damages caused by the sinking of the "Lukie." Not only has the defendant failed to rebut the presumption, but the defendant cannot, through the evidence submitted in support of its motion, show that there is no genuine issue of material fact concerning when the "Lukie" came to get a hole in its hull. Summary judgment should be denied for both of these reasons.

Finally, as the "Lukie" sank and lay in the bottom of New Haven harbor causing an obstruction to a navigable waterway, and leaking fuels, the plaintiff undertook a rescue/salvage operation. In the course of that undertaking, other vessels and equipment of the plaintiff sank. The defendant cannot disclaim liability by speculating as to some other mysterious/unknown cause for the sinking of those vessels/equipment. The "rescue invites peril" doctrine holds the defendant liable for the foreseeable consequences of negligence in causing the "Lukie" to sink. Summary judgment must be denied on this basis as well.

PLAINTIFF, GARDELLA
EQUIPMENT CORPORATION


By_____
Edward M. Rosenthal
WILLCUTTS LAW GROUP, LLC
21 Oak Street, Suite 602
Hartford, CT 06106
Tel: (860) 524-6800
Fax: (860) 524-7766
email: emr@willcutts.com
FedBar # ct12958

## CERTIFICATION

I hereby certify that a copy of the attached has been served in accordance with the applicable Rules of Practice and/or Procedure on October 14, 2004 on:

Anthony R. Kovalcik
Moye, O'Brien, O'Rourke
Pickert & Martin, LLP
800 South Orlando Avenue
Maitland, FL 32751
Tel no.: (407) 622-5250
Fax no.: (407) 622-5440

By _____
        Edward M. Rosenthal
        Willcutts Law Group, LLC
        FedBar# ct12958
        21 Oak Street, Suite 602
        Hartford, CT 06106-8002
        Tel no. (860) 524-6800
        Fax no. (860) 524-7766