UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
(Bridgeport)

| | |
|---|---|
| GARDELLA EQUIPMENT CORPORATION ) | CIVIL ACTION |
| Plaintiff, ) | NO. 3:02CV2076 (AHN) |
| ) | |
| v. ) | |
| ) | |
| BALFOUR BEATTY CONSTRUCTION, INC., ) | |
| Defendant. ) | |
| and ) | |
| BALFOUR BEATTY CONSTRUCTION, INC., ) | |
| Counterclaim Plaintiff ) | |
| v. ) | |
| GARDELLA EQUIPMENT CORPORATION, ) | GARDELLA EQUIPMENT |
| Counterclaim Defendant. ) | CORPORATION'S |
| and ) | AMENDED LOCAL |
| ) | RULE 56(a)2 STATEMENT |
| BALFOUR BEATTY CONSTRUCTION, INC., ) | |
| Third-Party Plaintiff, ) | |
| v. ) | |
| NORWALK MARINE CONTRACTORS, INC. ) | |
| Third-Party Defendant. ) | OCTOBER 26, 2004 |

## PLAINTIFF'S LOCAL RULE 56(a)2 STATEMENT

1. Admitted.

2. Plaintiff admits that in May 2001 the "Lukie" was purchased from Local Towing, Inc., but is unable to admit or deny when Local Towing acquired the vessel.

3. Admitted.

4. Admitted.

5. Denied. Exhibit C, p.80, 89, 143; Exhibit D, p.37; Exhibit E, p.17-18; Exhibit F, p.45, 47-48, 79; Exhibit H, p. 10-11, 26.

6. Plaintiff is unable to admit or deny this statement.

7. Denied. Exhibit F, p.45, 79.

8. Admitted.

9. Admitted.

10. Admitted.

11. Admitted that this was the "Date of Issuance" of the Endorsement to the insurance policy adding the "Lukie" to the policy.

12. Admitted that for insurance purposes the "Lukie" was valued at $60,000.

13. Admitted.

14. Admitted that McIntosh made telephone calls but denied that the sole purpose was to gather information for his superiors. Exhibit F, p.56; Exhibit C, p.24, 65, 72.

15. Denied. Exhibit C, p.24, 65, 72; Exhibit F, p.56.

16. Denied. Exhibit C, p.24, 65, 72; Exhibit F, p.56.

17. Admitted.

18. Admitted.

19. Admitted that an oral agreement was entered into and memorialized by the Charter Agreement faxed by Skip Gardella to Buddy McIntosh on August 29, 2001.

20. Denied. Exhibit A. Exhibit C, p.72.

21. Admitted.

22. Admitted that this was the "Date of Issuance" of the Endorsement to the insurance policy deleting the "Lukie" from the policy.

23. Denied. Exhibit C, p. 139-140, 142-143, 148, 151-153, 155, 160.

24. Admitted.

25. Admitted that the "Lukie" was used by Balfour Beatty but denied that it was used with due care and without incident. Exhibit K, p. 39, 44-45, 64, 77.

26. Denied. Exhibit K, p. 39, 44-45, 64, 77.

27. Admitted.

28. Admitted.

29. Admitted.

30. Admitted.

31. Admitted.

32. Admitted.

33. Denied. Exhibit F, p.67, 71-73; Exhibit J, p.14,18-19; Exhibit H, p.27; Exhibit G, 15, 17, 24, 26-27; Exhibit I, p.21; Exhibit E, p.6.

34. Admitted.

35. Denied. Exhibit A; Exhibit F, p.64, 78, 80-82; Exhibit I, p.30; Exhibit B, 111-112, 116.

36. Admitted.

37. Admitted.

38. Admitted that neither Gallogly or Tunila noticed water coming into the "Lukie" while they were on board solely to check the fuel levels. Exhibit G, p. 15, 17, 26-27; Exhibit J, p.14, 18-19.

39. Admitted that Gallogly, Tunila, and Amenta casually glanced at the "Lukie" during this period and from the barge where they were working they did not notice anything.

40. Plaintiff can neither admit nor deny this statement as Frank Post is no longer employed by plaintiff and has not been deposed.

41. Admitted that this was the "Date of Issuance" of the Endorsement to the insurance policy adding the "Lukie" back on to the policy.

42. Admitted.

43. Admitted.

44. Admitted that the "Lynn," "Jane O," crane, and pumps were found sunk in New Haven harbor but denied that this happened before any attempt was made to raise the "Lukie". Exhibit F, p.87, 93.

45. Plaintiff can neither admit or deny the statement as the statement is unintelligible.

46. Admitted.

47. Admitted.

48. Admitted.

49. Admitted.

50. Admitted.

51. Admitted.

52. The plaintiff can neither admit or deny the statement.

53. Admitted that this is what the insurance company determined.

4

54. Admitted.

55. Admitted.

56. The plaintiff can neither admit or deny.

57. The plaintiff can neither admit or deny.

58. Admitted.

59. Denied. Exhibit F, p.45, 47-48, 79; Exhibit H, p. 10-11, 26; Exhibit C, p.80, 89, 143; Exhibit D, p.37; Exhibit E, p.17-18.

60. Denied. Exhibit K, p.68.

61. Admitted.

62. Denied. Exhibit K, p. 44, 64, 77.

63. Admitted.

64. Denied. Exhibit K, p. 44, 64, 77.

65. Denied. Exhibit K, p. 44, 64, 77.

66. Admitted that CNA made these determinations.

67. Admitted that this was CNA's determination.

68. Admitted.

69. Admitted that Podoloff and Stafford speculated that the "Lynn" sank due to vandalism.

70. Plaintiff can neither admit or deny.

71. Admitted that this was the speculation at that time.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

1. When the plaintiff purchased the "Lukie" she was in decent condition. (Exhibit F, p.45, 79), her condition not having changed very much in the preceding years. (Exhibit F, p.44). After acquiring the "Lukie," the plaintiff performed repairs on the "Lukie" such as work on the engine, generator, and general housekeeping such as painting, cleaning, and replacing windows (Exhibit F, p. 46).

2. NMCI's employee, John Amenta, performed an underwater inspection of the "Lukie" shortly after she was acquired, and performed a minor repair to the rudder (Exhibit F, p.46-7) (Exhibit I, p.10-11) (Exhibit B, p., 1, 44-46). The "Lukie" was in good condition. (Exhibit F, p.47-48).

3. The "Lukie" was in good condition when the defendant obtained her on September 4, 2001 (Exhibit F, p.45, 79), and was deemed seaworthy (Exhibit H, p. 26) by defendant's employee who was on her nearly every day while defendant had the "Lukie." Other than the "Lukie" being dirty, there were no problems with her when it was first obtained by defendant (Exhibit H, p.10-11). At the commencement of the defendant's charter of the "Lukie," defendant's construction superintendent and her captain determined after inspecting it that the "Lukie" was in acceptable condition for defendant's purposes (Exhibit C, p.80,89) (Exhibit D, p.37)(Exhibit E, p.17-18), and in fact that it was in seaworthy condition (Exhibit C, p.143).

4. Defendant and plaintiff had done business together previous to the "Lukie". (Exhibit F, p. 54). Negotiations concerning the "Lukie" were between McIntosh and Gardella. (Exhibit F, p.56) (Exhibit C, p. 24, 65). Defendant wanted to use the "Lukie" on the Housatonic River to move barges (Exhibit F, p. 60) (Exhibit H,

6

p.16-17) (Exhibit C, p.31). McIntosh testified that he was familiar with the "Lukie" prior to chartering it from being aboard it and seeing it in the Connecticut waterways many times (Exhibit C, p.37). McIntosh was aware that the "Lukie" needed cosmetic work. (Exhibit C, p.39) and that defendant was taking the "Lukie" on an "as is" basis (Exhibit C, p.97). After McIntosh and Gardella discussed the agreement's terms on the phone, Gardella faxed McIntosh the agreement, and then defendant took possession of the "Lukie." (Exhibit C, p.72).

5. Plaintiff did not provide a crew or supplies to the defendant to go with the "Lukie" (Exhibit C, p.68). While the defendant had the "Lukie," between September 4, 2001 and October 13, 2001, defendant's employee Brake was the only person to captain the "Lukie," and Javes was the only one who worked on it (Exhibit H, p. 17-18, 33) (Exhibit C, p.63, 94, 107) (Exhibit D, p.41). At no time did any employee of plaintiff or NMCI board the "Lukie" (Exhibit C, p.95). Defendant was free to use the "Lukie" in any way it wanted (Exhibit H. p. 18). No limitations were placed on how defendant could use the "Lukie" by plaintiff or NMCI. (Exhibit C, p.82-84). Defendant was in sole possession of the "Lukie" during this time period. (Exhibit C, p.152-153).

6. Defendant experienced no problems or difficulties with the "Lukie" during the time they had it (Exhibit C, p.86, 100, 168), nor did they have to expend any money on repairs for the "Lukie," and in fact the "Lukie" helped to keep defendant's operations moving on the Sikorsky Bridge project (Exhibit C, p.87).

7. Defendant performed an on-hire survey of the "Lukie" when they obtained it in September 2001. (Exhibit C, p.139-140,142-143, 148, 151-153,155, and 160)

8. When McIntosh called plaintiff to inform plaintiff that defendant no longer needed the "Lukie," NMCI's vice-president Wetmore made arrangements to have an underwater survey performed the following day. McIntosh told Wetmore that they were going to return the "Lukie" late on Friday and Wetmore intended to go to New Haven harbor on Saturday to perform the underwater survey. (Exhibit F, p. 64, 78, 80-82)(Exhibit I, p.30)(Exhibit B, 111-112,116)).

9. Neither Amenta, nor any other NMCI employee in New Haven harbor on October 12, 2001 were instructed to inspect the vessel when returned by defendant. (Exhibit F, p. 67) (Exhibit J, p.14, 18). NMCI's employees, Tunila and Gallogly checked the fuel level only (Exhibit F, p. 71-73) (Exhibit H, p. 27) (Exhibit G, p. 15, 17, 26-27) (Exhibit J, p. 18-19) (Exhibit I, p.21) (Exhibit E, p.6). Gallogly never reported that the "Lukie" was in satisfactory condition as that was not his position to perform such an inspection. (Exhibit G, p. 24) (Exhibit I, p.23). After Gallogly checked the fuel levels and left the "Lukie," no other NMCI employee boarded the "Lukie" prior to its sinking (Exhibit G, p.29) (Exhibit J, p.25) (Exhibit I, p.25).

10. When Wetmore arrived to the harbor at daylight on Saturday, the "Lukie" was sunk (Exhibit F, p.84-85). Oil was leaking out of the "Lukie" and Wetmore took an oil containment boom to contain the oil, and notified the Coast Guard and the Connecticut DEP. (Exhibit F, p. 87).

11. Wetmore started immediately making preparations to raise the "Lukie" by pumping air into it. NMCI's divers inspected the "Lukie" while sunk. (Exhibit F, p. 93).

12. It is unknown why the "Lukie" sank. (Exhibit F, p. 95). (Exhibit G, p.31) (Exhibit J, p.31) (Exhibit I, p.31).

13. It is unknown why the "Lynn" "Jane O", the pumps and crane sank. It was pure speculation that they sank because of vandalism (Exhibit F, p. 100-101).

14. The "Lukie" sank because it hit something while being operated by defendant. The Hull was not thin enough to cause it to sink. (Exhibit F, p. 149). The "Lukie" did not sink because of corrosion or lack of maintenance. Missing barnacles from the bottom of the "Lukie" indicated that the "Lukie" ran over something. (Exhibit F, p. 150, 153). Barnacles did not come off the hull following the raising of the "Lukie." (Wetmore, p. 151). A poorly maintained hull was not the cause of the "Lukie" sinking. (Exhibit C, p.171-172) (Exhibit K, p.44, 64, and 77).

PLAINTIFF, GARDELLA<br>
EQUIPMENT CORPORATION<br>
<br>
By_____<br>
Edward M. Rosenthal<br>
WILLCUTTS LAW GROUP, LLC<br>
21 Oak Street, Suite 602<br>
Hartford, CT 06106<br>
Tel: (860) 524-6800<br>
Fax: (860) 524-7766<br>
email: emr@willcutts.com<br>
FedBar # ct12958

## CERTIFICATION

I hereby certify that a copy of the attached has been served in accordance with the applicable Rules of Practice and/or Procedure on October 26, 2004 on:

Stephen W. Pickert, Esq.
Anthony R. Kovalcik
Moye, O'Brien, O'Rourke
Pickert & Martin, LLP

9

800 South Orlando Avenue
Maitland, FL 32751

_____
Edward M. Rosenthal, Esq.
Willcutts Law Group, LLC